**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

EDITH FORD, TONYA BALLARD, and
DAWN FOSTER-TAYLOR,

        Plaintiffs,

        v.

CHICAGO MERCANTILE EXCHANGE
INC.,

        Defendant.

No. 12 C 9917
Judge James B. Zagel

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Edith Ford ("Ford"), Tonya Ballard ("Ballard"), and Dawn Foster-Taylor ("Foster-Taylor") (collectively "Plaintiffs") are current and former employees of Defendant Chicago Mercantile Exchange Inc. ("CME" or "Defendant"). Plaintiffs bring this action under the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII") and the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA").

In Counts I–III, Plaintiffs allege that Defendant, in violation of Title VII, discriminated against them on the basis of their sex (female) and race (African-American) by failing to train them, failing to promote them, paying them less than people outside of their protected classes, and wrongfully terminating Ford. In Count IV, Plaintiffs allege that Defendant violated the EPA by paying different wages to male and female employees who held substantially the same job positions on the basis of their sex.

This case is presently before me on Defendant's motion for summary judgment on all claims. For the following reasons, Defendant's motion for summary judgment is granted in its entirety.

1

**FACTS AS ALLEGED**

All three Plaintiffs are African-American females. Before their job at the CME, Plaintiffs each held a variety of clerical and administrative jobs unrelated to trading, derivatives contracts, and the financial markets.

CME operates a variety of markets for the trading of derivatives contracts worldwide. Prior to 1992, CME offered all of its global trading through an "open outcry" system, where floor traders called out, or signaled through complex hand gestures, the key trade information from the trading pit.

CME originally hired Plaintiffs as Market Reporters to observe and record prices of live trades on the trading floor: Plaintiff Ford in September 1991, Plaintiff Ballard in December 1991, and Plaintiff Foster-Taylor in September 1990. Plaintiffs were each promoted "several times rising from a level 1 Market Reporter to a level 4 Market Reporter."

*CME Launches Globex and Transfers Plaintiffs to the GCC*

CME first introduced its electronic trading platform, CME Globex ("Globex"), in 1992. To provide customer service and technical support for Globex users, CME established the Globex Control Center ("GCC"). GCC staff consists of Analysts, Senior Analysts, and Lead Analysts, listed in order of increased responsibility and pay.

The use of Globex rapidly expanded. By 2004, the number of electronic Globex trades exceeded the ones executed on the trading floor. With trades increasingly made through Globex rather than the trade floor, CME assigned many of its Market Reporters, including Plaintiffs, to the role of GCC Analyst. Plaintiffs Ballard and Foster-Taylor in 1999 and Plaintiff Ford in April 2000 became GCC Analysts.

As GCC Analysts, Plaintiffs answered customer questions about market operations and moderated cancellation requests for "error trades," which were trades that, according to the customer, were mistakenly executed at an incorrect price or quantity. Upon request, CME made the decision to cancel a trade based on the information gathered by GCC Analysts.

CME provided former Market Reporters with additional training when they became GCC Analysts, which included learning protocol, testing new trading tools, and listening in on calls taken by other GCC Analysts or supervisors. Plaintiffs also took classes related to the industry through an internal Professional Development Department, and in the case of Ballard and Foster-Taylor, online classes offered by University of Phoenix.

Ballard and Foster-Taylor were both promoted to Senior GCC Analyst in September 2000 and July 2001, respectively. In 2001, Ballard and Foster-Taylor were the highest ranked GCC employees, both receiving 8 out of 10 performance ratings. Foster-Taylor was recommended by Paul Millhuff, a Senior GCC Analyst who worked with her in the Eurodollar pit, and Mark LaPedes, one of her supervisors.

In addition to the duties performed by GCC Analysts, Senior GCC Analysts had the responsibility of opening, closing, and halting Globex markets. Senior Analysts also had more responsibility with respect to error trade decisions, where they played a vital function by figuring out what took place, gathering all the data together, and participating in the internal error trade committee's decision regarding whether or not a trade should be canceled.

*CME Creates the Pro Desk*

As trading migrated from the trading floor to Globex, CME created a new customer service program that focuses exclusively on high-volume traders, the GCC Pro Desk ("Pro Desk"). According to CME, it decided to staff the Pro Desk with individuals who had firsthand

trading experience because these individuals could provide the highest level of market support to its premium customer base. Because incumbent GCC employees, largely recruited from Market Reporters, did not possess the trading experience and market knowledge to work on the Pro Desk, CME staffed the Pro Desk almost entirely with new hires.

CME announced its decision to hire ex-traders for the new Pro Desk positions before hiring began in May 2002. Prior to this hiring wave, the existing GCC Analysts and Senior GCC Analysts included ten non-African-American males, four African-American males, two non-African-American females, and three African-American females (Plaintiffs).

Between November 24, 2003 and September 20, 2004, CME hired seven Caucasian males as Senior GCC Analysts.[1] These new hires skipped the entry-level position—GCC Analyst—and started at the Senior level. All seven of these new hires possessed firsthand trading experience. Specifically,

- New Hire #1 previously traded currency options and futures on the CME floor and worked as a managing partner for an equity firm analyzing and advancing new methods for effective and profitable equity index futures trading.

- New Hire #2 previously worked as a Globex broker and as a commodity and options trader.

- New Hire #3 worked as a trader in futures, soft and hard commodities, foreign exchange, and treasuries.

- New Hire #4 had 18 years of experience in the financial industry including experience managing portfolios with currency, options, and futures.

- New Hire #5 previously worked as a futures trader on Globex.

---

[1] These are the dates that are most relevant to this lawsuit because Plaintiffs filed their EEOC complaint on September 20, 2004 and, as discussed below, I may only consider Plaintiffs' sex and race employment discrimination claims with regards to conduct that occurred within 300 days of this unless the conduct is only being presented as "background evidence."

- New Hire #6 previously worked as a chief dealer for a foreign exchange and money market and as a vice president and senior dealer pricing and funding a Eurodollar offshore portfolio and introducing derivative instruments to enhance profitability.

- New Hire #7 had 20 years of trading experience, 14 of which he utilized Globex for electronic trading.

Although the new Pro Desk hires had trading experience, Plaintiffs contend that they lacked customer service experience, noting they had "considerably less experience in electronic trading support" than existing GCC employees. The new Pro Desk hires were given specialized training on new software tools and futures and options products. They also were introduced to the "high level" customers touring the GCC.

Only one incumbent GCC Analyst, an African-American male, was promoted to Senior GCC Analyst position between November 2003 and September 2004. LaPedes, the same person who had recommended Foster-Taylor for a promotion to Senior Analyst in 2001, commented at one point that the new employees hired to fill the Pro Desk positions were "segregated" and "gerrymandered" from the rest of the GCC.

During this time period, November 24, 2003 through September 20, 2004, CME also promoted five male Caucasian GCC Senior Analysts to Lead Analyst positions, all of whom had trading experience/market knowledge and had ratings higher than Ballard and Foster-Taylor. Neither Ballard nor Foster-Taylor was promoted to Lead Analyst.

Employees on the Pro Desk received higher starting salaries than the rest of the GCC staff. The Pro Desk starting salary was at least $70,000, which CME claims was necessary to incentivize traders to take a job in customer service. In comparison, Ford's salary as a GCC Analyst around this time was approximately $37,000, Ballard's salary as Senior Analyst was

$50,000, and Foster-Taylor's salary as Senior GCC Analyst was $43,000. Plaintiffs allege that new employees were told about a "great secrecy" regarding how their salaries were "constructed."

LaPedes told Ford and others that the new employees received higher salaries because they will "do more" work. One of Ford's supervisors, Clarence Kelly, however, testified that the employees at the Pro Desk "weren't doing anything more difficult or more complex . . . than the folks who had been at the GCC longer than them."

<em>Plaintiffs' Performance Evaluations at the GCC</em>

The quality of Plaintiffs' work at the GCC is in dispute. For all three Plaintiffs, there is evidence that Plaintiffs received praise, but also evidence that they made errors on occasion that their supervisors discussed with them.

With respect to Plaintiff Ford, Kelly testified that Ford took care of "everything that [the shift] needed to do," and another one of her supervisors, George Stein, testified that Ford was a "breeze to work with" and "very competent." On the other hand, however, Millhuff repeatedly spoke with Ford about her failure to escalate calls she could not handle on her own, and in June 2003, gave Ford written discipline for neglect of operational oversight responsibilities. CME also states that, in December 2004, Ford gave incorrect information to a customer and, in June 2003, failed to catch Foster-Taylor's recording error as a "spotter," someone who checks that the person performing the daily checklist inputs accurate information. Ford received a score of 6 out of 10 in her 2003 year-end performance review, a mark in the lower end of "meets all requirements" category. Millhuff told Ford in this performance review that she needs to "strive to eliminate mistakes in Operational Oversight roles" and "work to improve market knowledge and call management skills." During her 2004 mid-year performance

review, Millhuff told Ford that she needed to "improve knowledge of and ensure 100% Accuracy in Market Assistance" and "continue to improve breadth of skills in Operations Oversight." Ford again received a 6 out of 10 rating in her 2004 year-end performance review. This review stated Ford needed "marked improvement in handling Critical and Market Assistance calls" and technical assistance calls.

After Ballard was promoted to the Senior Analyst position in 2000, Ballard was nominated for a CME Excellence Award given to employees who go "above and beyond" what is expected of them. Prompted by customer complaints in 2003 and 2004, however, Millhuff testified that he observed Ballard's repeated failure to escalate calls when she did not fully understand customer requests. In November 2003, Ballard miscommunicated with a customer and erroneously cancelled a group of orders. During her 2003 mid-year performance review, Millhuff told Ballard that she needed to obtain an understanding of trading principles as they apply to electronic trading. He repeated this criticism in Ballard's 2003 year-end review, in which he gave her a 6 out of 10 rating. The supervisor who replaced Millhuff gave Ballard the same rating in her 2004 year-end performance review. Both supervisors pointed out Ballard's need to "improve with Market and Technical Assistance Calls" in her 2004 mid-year and year-end performance reviews.

Although Foster-Taylor received praise for being a "great analyst" and a "stellar" employee who did "excellent work," CME claims Foster-Taylor failed to properly escalate calls and erred in her operational oversight responsibilities. Millhuff, in June 2003, gave Foster-Taylor a warning for entering incorrect information and sending command too early as the shift's daily checklist "holder." Prompted by customer complaints in 2003 and 2004, Millhuff observed Foster-Taylor's calls and noted she had failed to escalate calls appropriately.

Millhuff gave Foster-Taylor, a Senior GCC Analyst, a rating of 6 out of 10 in her 2003 performance review and stated she needed "to comprehend advanced trading principles as applicable to electronic trading" in order to improve performance. Foster-Taylor received the same rating in her 2004 performance review with comments stating she needed "marked improvement with handling of Market Assistance calls" and "Technical and Critical Assistance calls."

*CME Omits Plaintiffs from Initial GCC Call Routing List*

In August 2004, CME implemented another new customer service program—the GCC Call Routing List. This internal program allowed GCC Analysts, when they were not confident in their ability to handle a customer request, to transfer calls to a "subject matter expert" and listen to how the expert handles the call. When the initial GCC Call Routing list was distributed on August 4, 2004, Plaintiffs were not included as subject matter experts.

The reason for this omission is in dispute. Plaintiffs assert that LaPedes and Millhuff left them off the list to block them from obtaining advanced GCC positions. Plaintiffs claim they would "essentially not have a function" within the GCC without appearing on the list. The only women on the list, according to Plaintiffs, were administrative assistants. When she discovered that she was not on the list, Ballard promptly sent an email to GCC management noting that the "women in the department were not included on the list." Plaintiffs also filed a written complaint to CME's Human Resources Department.

According to Defendant, however, Plaintiffs' omission from the list was nothing more than a one-time mistake. When Plaintiffs met with LaPedes in mid-August to discuss their omission, LaPedes told Plaintiffs, "hey ladies, I just want you to know that I'm not discriminating against you. It's just — I've dropped the ball. We'll work on it . . . ." A few

weeks later, CME circulated a revised list that included Plaintiffs as subject matter experts.

During this meeting, LaPedes blamed another GCC manager, Miles Sczeurek, for the fact that Plaintiffs were excluded from the call routing list and not identified as experts in any subject matter. According to Ballard, however, Sczeurek said that it was "utterly ridiculous" that Plaintiffs were left off of the call routing list and not identified as subject matter experts, that he was not the person who left them off of the list, that the call routing list was prepared "by design" and "by plan," and that any "blame" belonged to LaPedes.

At some point after Plaintiffs filed a complaint with CME's Human Resources Department, a group of CME managers went for post-work dinner and drinks at McCormick & Schmick's. At dinner, Kelly claims that LaPedes told him that LaPedes was devising a way to get rid of Plaintiffs by transferring them to other areas of the GCC in a way that would not look "retaliatory." According to LaPedes, he never used these words, but instead only discussed "trying to find better fits for people who were struggling."

Kelly further testified that, during 2004–05, he was directed by GCC management to review, evaluate and rate calls from GCC employees, focusing his attention on employees who were making mistakes. Kelly testified that he thought that listening to some people's calls more often than others made him feel as if he was "targeting" certain people by "skewing the data."

*Plaintiffs' Subsequent Promotions, Transfers, and Terminations*

LaPedes offered Ford a new position as a Senior GCC Administrator on May 6, 2005. Starting June 2005, Ford helped set up individuals and firms with a user ID for Globex. She received positive performance reviews and regular pay raises with her salary in 2005, eventually reaching $52,000. Her supervisor promoted her to Lead GCC Administrator in February 2007 at an increased salary of approximately $60,000. Ford was terminated in 2009, however, after she

collected $4,609 from thirty-two coworkers for a White Sox outing then used the money to pay her personal bills.

In 2007, LaPedes told Ballard to "seek other opportunities" and told her about a lateral transfer opportunity in CME's Customer Service for Electronic Trading department as a Senior Support Specialist. In the new position, which Ballard accepted, she provides technical assistance to developers by testing the electronic trading platform. Ballard's salary was increased to approximately $70,000 in 2012.

Foster-Taylor laterally transferred to Certification Environment Testing ("CERT") in 2006, while keeping the title Senior GCC Analyst. At CERT, Foster-Taylor took calls from customers involved in mock trades. In August 2008, Foster-Taylor was promoted to Lead GCC Analyst in CERT on Millhuff's recommendation and her salary was increased to approximately $75,000. In October 2009, Foster-Taylor was transferred to the Enterprise Application Systems Enterprise department as a Lead Trading Application Support Representative, where she handles Globex registrations, firm changes, and trade ID cancellations.

## LEGAL STANDARD

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party has set forth the basis for summary judgment, the burden then

shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

I consider the record in the light most favorable to the non-moving party, and I draw all reasonable inferences in the non-movant's favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir.2002). I will accept the non-moving party's version of any disputed fact, however, only if it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

## DISCUSSION

Plaintiffs allege that Defendant violated Title VII by (1) refusing to provide them with equal training opportunities as those employed at the Pro Desk; (2) failing to promote them to Senior and/or Lead roles and to staff the Pro Desk; (3) paying them lower wages for performing same work; and (4) wrongfully terminating Ford. All of Plaintiffs' Title VII claims stem from alleged discrimination on the basis of Plaintiffs' sex (female) and/or race (African-American). Additionally, Plaintiffs allege that Defendant violated the EPA by paying different wages to male and female employees who held substantially the same job positions on the basis of their sex.

## I.        Plaintiffs' Title VII Claims

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1).

All of Plaintiffs' Title VII claims ultimately fail here because the evidence does not show that Plaintiffs were treated any differently than the rest of the GCC staff—a group of people that was predominantly men and non-African-American—when the Pro Desk was created.

## A.        Limitations on Plaintiffs' Title VII Claims

Before I can consider the merits of Defendant's motion for summary judgment, I must first decide the threshold issue of which facts may be considered for this motion. Defendant argues that, under Title VII, any discrete acts that occurred either after Plaintiffs' September 20, 2004 EEOC filing date or more than 300 days prior to it cannot form the basis of Plaintiffs' Title VII claims, and I agree.

A person bringing a civil action under Title VII must first file an EEOC charge and receive a right-to-sue letter. *See* 42 U.S.C. § 2000e–5(f)(1)(A). An EEOC charge must be filed within 300 days of the allegedly unlawful employment practice. 42 U.S.C. § 2000e–5(e)(1). Furthermore, "claims brought in judicial proceedings must be within the scope of the charges filed with the EEOC[.]" *Conner v. Ill. Dep't of Natural Res.*, 413 F.3d 675, 680 (7th Cir. 2005). This prevents "an aggrieved employee" from "seek[ing] judicial relief for different instances of discrimination" than the ones the employee had originally complained about to the EEOC. *Id.* (quoting *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992)).

Yet in alleging various instances of discriminatory conduct not included in the EEOC charges—conduct that in fact predates September 24, 2003, and is therefore outside the 300-day limitations period—Plaintiffs' complaint attempts to do just that. That is improper. *See Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 681 (7th Cir. 2007) (showing that the employee is "time-barred from filing suit under Title VII for any 'discrete act' about which he did not file an EEOC charge within the 300-day EEOC charging deadline.").

To be sure, a plaintiff can allege claims outside the EEOC charge for instances "like or reasonably related to the allegations of the EEOC charge and growing out of such allegations." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013) (internal quotation marks, alterations, and citations omitted). But this principle applies only to *timely* allegations; otherwise "[d]iscrete discriminatory acts," even those "related to acts alleged in timely filed charges," are not actionable. *Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (internal quotation marks omitted) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)); *see Morgan*, 536 U.S. at 114 (holding that even though the employee alleged "numerous discriminatory and retaliatory acts" throughout the duration of his employment, "only incidents that took place within the timely filing period are actionable."). Plaintiffs are therefore precluded from alleging instances of discrimination that occurred more than 300 days before the filing of their EEOC charge.

Plaintiffs argue that the denial of training opportunities and promotions is a continuing violation here because it occurred throughout their employment. Under the continuing violation doctrine, a plaintiff may get relief for "a time-barred act by linking it with an act that is within the limitations period." *Selan v. Kiley*, 969 F.2d 560, 565 (7th Cir. 1992). A "continuing violation" exists when there is "a series of separate violations" where "it would have been

unreasonable to require the plaintiff to sue separately on each one.*" Id.* at 565 (citing *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1310 (7th Cir.1989)). The continuing violation exception does not apply here, however, because Defendant's alleged discriminatory acts are all discrete employment decisions, actionable on their own. *See Morgan*, 536 U.S. 101 at 114 (holding termination, failure to promote, denial of transfer and refusal to hire are discrete acts). Contrary to Plaintiffs' assertions, the continuing violation theory does not apply to discrete acts, even when they are "reasonably related" to the timely allegations set forth in the administrative charge. *Id*. at 114.

Plaintiffs also argue that the 300-day statutory cutoff should be equitably tolled, but this argument also fails. Equitable tolling is allowed "when despite all due diligence, the plaintiff cannot obtain the information to determine whether the injury was caused by wrongdoing." *Dauzvardis v. Midwest Generation, L.L.C.*, No. 01 C 8549, 2002 WL 31017436, at *4 (N.D. Ill. Sept. 9, 2002). Because CME announced its intent to hire people with trading experience to staff the Pro Desk before hiring the first group of ex-traders in 2002, the Plaintiffs had sufficient notice to file EEOC complaints for their grievances.

As a result, this court may only consider Plaintiffs' sex and race employment discrimination claims with regards to actionable conduct that occurred between November 24, 2003 and September 20, 2004. *See Morgan*, 536 U.S. at 112–13.

**B.      Ford's Termination Claim**

Because Plaintiff Ford's Title VII termination claim is clearly barred by the statute of limitations requirements discussed above, there is no need to analyze its merits.

Plaintiff Ford did not file an EEOC charge for her 2009 termination from CME within 300 days of her termination. Ford's termination -- based on theft, dishonesty and misuse of

company property -- is also unrelated to the allegations regarding denial of training opportunities, promotion, and increase in pay based on sex and race, allegations for which she did file a charge with the EEOC. Ford's termination claim cannot, therefore, be considered "like or reasonably related to the allegations of the EEOC charge and growing out of such allegations." *Lavalais*, 734 F.3d at 634 (7th Cir. 2013) (quoting *Moore v. Vital Prods., Inc.,* 641 F.3d 253, 256–57 (7th Cir. 2011)).

Accordingly, Defendant's motion for summary judgment with respect to Plaintiff Ford's termination claim is granted.

**C.        Plaintiffs' Failure to Train, Failure to Promote, and Disparate Pay Claims**

In addition to Plaintiff Ford's termination claim, all three Plaintiffs allege that CME refused to provide them with equal opportunities for training and assignments to advanced call center positions, failed to promote them to higher-level call center positions, and paid them lower wages for performing the same work. Because these three Title VII claims are factually intertwined, I will address all three of them together and, if necessary, describe any differences when they arise.

Plaintiffs bringing Title VII claims can defeat a motion for summary judgment under the direct or indirect method of proof. *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1068 (7th Cir. 2012). Under either method, Plaintiffs must first show that they suffered an adverse employment action. *See Chaib v. Ind.*, 744 F.3d 974, 982 (7th Cir. 2014) (concluding that regardless of method of proof, the employee is required to show he or she "suffered an adverse employment action as a result of [his or] her employer's alleged discrimination."). In other words, "not everything that makes an employee unhappy is an actionable adverse action." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009) (quotation marks and citation omitted). Even

though an adverse employment action is broadly defined, "an employee must show some quantitative or qualitative change in the terms or conditions of his employment or some sort of real harm." *Id.* at 1116–17 (quotation marks and citation omitted).

Here, there is no dispute that Plaintiffs' have properly alleged adverse employment actions. Plaintiffs' allegation, for example for "[t]he denial of a raise—even a purely discretionary one—can be an adverse employment action." *Harper v. Fulton Cnty., Ill.*, 748 F.3d 761, 767, 2014 WL 1363996, at *4 n.5 (7th Cir. 2014). Similarly, Plaintiffs' allegation that they were denied training opportunities that were only given to Pro Desk employees is also an adverse employment action. *See also Patel v. Allstate Ins. Co.*, 105 F.3d 365, 371 (7th Cir. 1997). As discussed above, however, we may only consider adverse employment actions that occurred between November 24, 2003 and September 20, 2004.

## 1.    Direct Method of Proof

Plaintiffs using the direct method of proof must provide sufficient direct or circumstantial evidence of a discriminatory motive behind their employer's action. *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).

Direct evidence is akin to an explicit admission that an employment decision was motivated by discrimination; it is rare. *See Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Direct evidence, if believed, proves "the particular fact in question without reliance upon inference or presumption." *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998) (internal quotation omitted). Direct evidence "can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005) (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). Direct evidence is a "distinct" type of evidence that uniquely reveals "intent to

discriminate[, which] is a mental state." *Id.*

Plaintiffs have failed to present any direct evidence here. Although some of the statements made by LaPedes -- specifically, his use of the terms "segregated," "gerrymandered," and "you girls" -- create suspicion, they fall short of being direct evidence. The Pro Desk did in fact operate as a separate and distinct entity from the rest of the GCC, and addressing the Plaintiffs as "you girls," though certainly not the best choice of words, does not conclusively show that LaPedes was discriminating against them based on sex. Suspicion of racial intent is not enough; direct evidence requires acknowledgement. *See Rudin* at 720 (citing *Troupe* at 736).

Similarly, the statements that LaPedes made to Kelly at their post-work dinner event in 2004 fail as direct evidence because they are ambiguous and unrelated to Plaintiffs' ability to join the Pro Desk or otherwise receive a promotion during the relevant time period. Specifically, there is important context to consider: (1) these statements were made after the relevant actionable conduct occurred; (2) these statements are not sufficiently related to any of the actionable conduct that was alleged in the complaint, but instead appear to describe an intent to retaliate, which was not alleged; and (3) the majority of GCC staff outside of the Pro Desk were neither African-American nor female. Prior to hiring Pro Desk employees, the GCC Analysts and Senior GCC Analysts were predominantly men and non-African Americans. With this in mind, the statements made by LaPedes cannot be considered direct evidence of Title VII discrimination.

Plaintiffs also attempt to establish their Title VII claims through the direct method of proof using circumstantial evidence. To survive summary judgment, Plaintiffs' circumstantial evidence must cohere to create "a convincing mosaic . . . that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman v. Bd. of Educ. of the City of Chi.*,

637 F.3d 729, 734 (7th Cir. 2011). Circumstantial evidence of discrimination may include: (1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action. *Darchak v. City of Chi. Bd. of Ed.*, 580 F.3d 622, 630 (7th Cir. 2009); *Rudin*, 420 F.3d at 720-21. To be convincing, Plaintiffs' collection of circumstantial evidence must "directly point to a discriminatory reason for the employer's action and also be directly related to the employment decision." *Whitfield v. Int'l Truck and Engine Corp.*, 755 F.3d 438, 443 (7th Cir. 2014).

To support their case, Plaintiffs argue that the statements made by LaPedes that have been discussed above are ambiguous statements or behavior towards other employees in the protected group: namely LaPedes' use of the terms "segregated," "gerrymandered," and "you girls" as well as the statements that LaPedes made to Kelly during their dinner event at McCormick and Schmick's. *See Darchak*, 580 F.3d at 630 (7th Cir. 2009). These comments play a role in all three of Plaintiffs' Title VII claims.

Although the terms "segregated" and "gerrymandered" certainly contain racial connotations, the words themselves are far from being racial slurs. Moreover, they appropriately describe the structure of the Pro Desk because it was, in fact, a separate unit with its own staff.

Although addressing a group of women as "you girls" is certainly not laudable, it is not probative of discrimination here, or if it is, its probative value is insignificant. A statement is not probative of discrimination if it was an "isolated comment" not made contemporaneously with the adverse employment action or causally related to the decision-making process with respect to the adverse employment action. *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir.

2012) (quoting *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997)).

The most suspicious comments that were made by LaPedes occurred during the CME's managerial dinner event at McCormick and Schmick's. As Kelly testified, LaPedes alluded to a plan to move Plaintiffs into other departments. These comments, as described above, however, were made after the alleged actionable conduct occurred and seem to describe the intent to retaliate in the future, something Plaintiffs did not complain of. Even if we infer from LaPedes' comments that LaPedes told supervisors like Kelly to focus on people who were making errors in an attempt to target the Plaintiffs specifically, this inference would not save Plaintiffs' Title VII claims because there is no evidence in the record that anyone joined the Pro Desk without possessing trading experience regardless of their performance reviews. The statements made by LaPedes fail to create "a convincing mosaic," because, even after we assume that Kelly's testimony is true, there is nothing in the record that shows Plaintiffs were treated differently than any other GCC employee who was not on the Pro Desk.

Plaintiffs also argue that they were denied training opportunities when they were left off the initial GCC Call Routing List, and they claim that testimony from Sczeurek, namely where he said the omission was done "by plan," proves that they were discriminated against. The problem with this argument, however, is that the GCC Call Routing List was not a program for training people on the list, but rather a method for training employees not on the list. Plaintiffs are in effect complaining of losing the opportunity *to train someone else* rather than losing the opportunity *to train*. Furthermore, this omission, inadvertent or not, was remedied within a few weeks. This event, though certainly a piece of the "mosaic," is not a particularly persuasive evidence of discriminatory intent.

It is not surprising that GCC staff members were upset when the Pro Desk was created.

19

The Pro Desk paid better, offered additional training, and required something that most of them did not possess: trading experience. As discussed earlier, however, Plaintiffs were not the only people who missed out. To the contrary, the majority of people who were disadvantaged by the creation of the Pro Desk and its hiring requirements were men and non-African-Americans. With this in mind, the isolated statements made by LaPedes are nothing more than "stray remarks," that, while rude and insensitive, are too remote from the employment decision at issue to defeat summary judgment. *See Overly v. KeyBank Nat'l Ass'n,* 662 F.3d 856, 865 (7th Cir. 2011).

Plaintiffs need not present evidence in all three categories of circumstantial evidence. *See Diaz*, 653 F.3d at 587. For the purposes of this decision, however, it is worth noting that Plaintiffs have not presented any evidence in either of the two remaining categories of circumstantial evidence. *See Darchak*, 580 F.3d at 630.

Plaintiffs here have not presented any evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment. During the relevant time period, Plaintiffs cannot point to one member of the GCC staff who received a promotion or placement on the Pro Desk and did not possess previous trading experience. One white male was promoted from the GCC to the Pro Desk; this person, like everyone else on the Pro Desk, had firsthand experience as a trader. Plaintiffs have also failed to present any evidence of anyone outside of the Pro Desk who received higher pay.

The record is similarly devoid of any evidence that Defendant's proffered reason for denying Plaintiffs a position on the Pro Desk was pretextual. Plaintiffs' theory of pretext here is speculative at best. *See Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 513 (7th Cir. 2012); *Overly*, 662 F.3d at 864 ("[R]eliance on speculation is not enough to get the case to a jury."). Courts do not sit as "super-personnel departments" to review the wisdom or correctness of an

employer's decision. *See Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006); *see also O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001). My concern is whether Defendant's stated nondiscriminatory ground for the action of which the Plaintiffs complain is the true ground, i.e., not a pretext for discrimination. *Forrester v. Rauland–Borg Corp.*, 453 F.3d 416 (7th Cir. 2006).

According to Defendant, the decision to require trading experience was based on a desire to increase market experience in its customer service department. Defendant applied this criterion to 100% of the employees hired to the Pro Desk during the relevant time period. Furthermore, the fact that the new hires were placed directly into "Senior" position and had a higher starting salary can and does show CME subjectively and "honestly believed" they needed to attract new employees with enhanced qualifications. *See Radentz v. Marion Cnty.*, 640 F.3d 754, 757–58 (7th Cir. 2011).

Plaintiffs argue that they were overly scrutinized by the management staff. There's no evidence, however, that this plan targeted Plaintiffs specifically. To the contrary, Kelly's testimony suggests that he was told to listen in on calls and then spend more time on people who made errors. This procedure appears to have been equally applied to everyone in the GCC, and therefore doesn't show discriminatory intent based on race and/or gender. Furthermore, any disagreement over Plaintiffs' performance reviews -- whether they are distorted or not -- has little bearing on Plaintiffs' claim because no one was hired on the Pro Desk without trading experience.

Considering the totality of evidence presented, no reasonable jury could find that Plaintiffs have presented a "convincing mosaic" of circumstantial evidence here. Plaintiffs have failed to present sufficient facts that would allow a reasonable jury to determine that their claims

had any merit, because the record shows that they were treated identically to everyone else at the GCC who lacked trading experience. Although LaPedes made insensitive comments, his statements are not enough to defeat a motion for summary judgment here. Accordingly, Plaintiffs may not proceed with their failure to train, failure to promote, and disparate pay claims under the direct method of proof.

## 2.      Indirect Method of Proof

Plaintiffs also attempt to defeat summary judgment by establishing a prima facie case of discrimination using the indirect, burden-shifting method of proof. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014).

Under the indirect method, Plaintiffs must first establish four requisite elements: (1) they belong to a protected class; (2) they met their employer's legitimate expectations; (3) they suffered an adverse employment action; and (4) similarly situated employees outside of their protected class were treated more favorably. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 591–92 (7th Cir. 2008); *Brewer v. Board of Trustees of the University of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). After this is accomplished, a presumption of discrimination shifts the burden of proof to the employer to articulate a legitimate non-discriminatory reason for its action. *Johnson v. Gen. Bd. of Pension & Health Benefits of the United Methodist Church*, 733 F.3d 722, 727–28 (7th Cir. 2013). An employer's legitimate non-discriminatory reason, if one is articulated, shifts the burden back to the plaintiff to show that the proffered reason is pretextual, which would then permit an inference that the employer's real reason was unlawful. *Id.*; *Nichols v. Southern Ill. Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007).

Because Defendant does not contest that Plaintiffs are members of a protected class

and have suffered adverse employment action, the only issues to evaluate here are whether

Plaintiffs' performance met CME's legitimate expectations and whether similarly situated

employees who are not members of a protected class were treated more favorably.

Here, Plaintiffs have clearly failed to establish the "similarly situated" requirement. To

be similarly situated, a comparator must be similarly situated in all material aspects. *Greer v. Bd.*

*of Educ. of City of Chi., Ill*., 267 F.3d 723, 728 (7th Cir. 2001); *see Lawhead v. Ceridian Corp*.,

463 F. Supp. 2d 856, 863 (N.D. Ill. 2006) (finding other job applicants were not similarly

situated when they had several more years of payroll and human resources experience than

plaintiff).  As discussed above, Plaintiffs have not presented evidence that any non-protected

GCC employees, who were not on the Pro Desk, received more favorable treatment. Everything

in the record suggests that they were treated exactly the same as Plaintiffs—that is, if they did

not have trading experience, they were unable to work on the Pro Desk. Because Pro Desk

employees are not similarly situated, it is immaterial for the context of a Title VII claim that they

were treated more favorably. Without this requisite element, Plaintiffs cannot establish a prima

facie case of discrimination under the indirect method.

Plaintiffs cannot proceed under either the direct or indirect methods of proof, so I am

granting Defendant's motion for summary judgment with respect to all of Plaintiffs' Title VII

claims. Counts I–III of the complaint are therefore dismissed with prejudice.

## II.       Plaintiffs' Equal Pay Act Claim (Count IV)

Plaintiffs allege that they were paid less than male GCC employees in violation of the

Equal Pay Act, which provides that an employer may not discriminate "on the basis of sex by

paying wages to employees . . . at a rate less than the rate at which he pays wages to employees

of the opposite sex for equal work on jobs the performance of which requires equal skill, effort,

and responsibility." 29 U.S.C. § 206(d); *see also Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 698–99 (7th Cir. 2003).

The burdens under the federal Equal Pay Act differ from those under Title VII. The plaintiff does not need to show any discriminatory intent on the part of the employer. *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 922 (7th Cir. 2000); *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998). The plaintiff does not have to make a prima facie case of discrimination, just of unequal pay. *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 822 (7th Cir. 2011). By virtue of the statute, an employee's "only burden is to show a difference in pay for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *King v. Acosta Sales and Marketing, Inc.*, 678 F.3d 470, 474 (7th Cir. 2012) (quoting § 206(d)(1)). If the employer then contends that the difference is explained by something other than gender, it must prove that its explanation actually accounts for the difference. *Id.*

Claims under the Equal Pay Act, however, are "forever barred unless commenced within two years after the cause of action accrued," unless the claims are based on "willful violation" which may be commenced within "three years." 29 U.S.C. § 255(a). Given the absence of any allegations of willful violation, Plaintiffs' allegations that CME paid them less than other male employees for equal work must be for conduct between December 12, 2010 and December 12, 2012 when the Plaintiffs filed their complaint.

Ford's EPA claim is clearly time-barred because she was terminated in 2009. Plaintiffs Ballard and Foster-Taylor's Equal Pay Act claims fail because neither of them introduced any evidence of disparate pay for individuals in the departments where they worked from December 2009 through December 2012. Though Plaintiffs Ballard and Foster-Taylor worked outside the

GCC during the actionable time period, both of them attempt to make their case comparing their pay to the pay of employees in their former GCC department. This is not "equal work requiring substantially similar skill, effort, and responsibilities." Accordingly, I grant Defendant's motion for summary judgment on Plaintiffs' Equal Pay Act claims and dismiss Count IV of the complaint.

## CONCLUSION

For the aforementioned reasons, I grant Defendant's motion for summary judgment in its entirety and dismiss all counts of the complaint.

ENTER:

James B. Zagel
United States District Judge

DATE: October 27, 2015